**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

RAYMOND MACK,

   Plaintiff,

    v.

EAST ALLEN COUNTY SCHOOLS, et al.,

   Defendants.

     CASE NO. 1:24-CV-102-HAB[1]
     CASE NO. 1:25-CV-63-HAB-ALT

## <u>OPINION AND ORDER</u>

Pro se plaintiff Raymond Mack ("Mack") is a former bus driver for East Allen County Schools ("EACS") who was fired in 2024. He is pursuing multiple claims stemming from his termination and the state's revocation of his bus driver certification. (ECF 26).

Mack is suing EACS, EACS Superintendent Marilyn Hissong ("Hissong"), EACS Director of Transportation Janet Good ("Good"), EACS Human Resources Director Patty Prosser ("Prosser"), EACS Assistant Director of Transportation Mark Smith ("Smith"), EACS Chief Financial Officer Patrick McCann ("McCann"), and Union Representative Charles Ward ("Ward") (collectively "School Defendants") under 42 U.S.C. § 1983 for violating his due process rights. He is also suing School Defendants for employment discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Additionally, he claims the School Defendants violated Section 301 of the Labor Management Relations Act ("LMRA"). (*Id.*).[2] As for the state, he sued Michael Larocco ("Larocco"), the Transportation Director for the Indiana Department of

---

[1] Mack filed the claims here in two lawsuits, this one, and Case No. 1:25-CV-63-HAB-ALT. All claims have been consolidated into this case. ECF 63.

[2] Mack also sued his union under Section 301 for failing to represent him. ECF 26. Although the union never appeared, the Court dismissed Mack's claim against the union when he sought an entry of default because the union could not be held liable under the LMRA. ECF 66.

Education ("IDOE"), claiming that Larocco violated his right to due process when he revoked his driver certification.

School Defendants have moved for summary judgment against Mack.[3] (ECF 81). Mack and Larocco have also cross-moved for summary judgment. (ECF 73, 93). The motions are fully briefed and ripe for ruling. Because Mack received due process, his discrimination claims lack factual support, and School Defendants cannot be held liable under the LRMA, School Defendants' motion against Mack will be GRANTED. But Mack's claim against Larocco is a different story. Mack's motion will be GRANTED and Larocco's DENIED because Mack was entitled to pre-deprivation process before Larocco summarily revoked his driver certification and none was provided.

## BACKGROUND

### I.    Mack's Failure to Respond to Statements of Material Facts

The following facts are undisputed unless otherwise noted, but the Court will address one thing at the outset. Mack largely failed to respond to Statements of Material Facts filed by School Defendants and Larocco. This means that the Court can consider their statements of fact admitted. FED. R. CIV. P. 56(e)(2). That said, Mack is proceeding without an attorney and, the Local Rules are more forgiving of summary judgment requirements for self-represented litigants. *See* N.D. Ind. L-R 56(b)(3) (allowing special dispensation for unrepresented parties). And on principle, courts are supposed to give self-represented parties some latitude. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Thus, the Court can and will consider whether Mack's statements are responsive to those made by Defendants if they have evidentiary support. *Cf. Osborn v. JAB Mgmt. Servs., Inc.*,

---

[3] Mack did, at different points, file motions purporting to seek summary judgment against the School Defendants. But as the Court explained in separate orders striking those filings, they were made well beyond the dispositive motion deadline. ECF 116, 128.

2

126 F.4th 1250, 1255 (7th Cir. 2025) (noting that such an approach falls within a district court's discretion).

## II.    Factual Background

### A. Mack's Disciplinary Incidents and Termination by EACS

EACS hired Mack, a black man, as a bus driver in 2019. (ECF 82, ¶ 14). To perform this role, Mack attended training and earned a school bus driver training certification from the IDOE. (*Id.* ¶ 15). This certification is often called a "yellow card." (*Id.* ¶ 51). Mack needed to have this yellow card to work as a bus driver for any state-accredited school in Indiana. Ind. Code § 20-27-8-15(a). While employed by EACS, he drove a regular education route and had a supplemental route for three special needs preschool students. (ECF 82, ¶ 16). EACS assigned Mack this route through a bidding system that took driver preferences and seniority into account. (*Id.* ¶¶ 17–18). Race was not a factor. (*Id.*). If EACS determines that a special needs student requires a monitor, EACS assigns a bus monitor for them. (*Id.* ¶ 20). The students on Mack's route did not require a bus monitor. (*Id.* ¶ 19).

Mack received his first written disciplinary warning in March 2020 for passing three vehicles and a garbage truck while driving students to an elementary school. (ECF 84-2, at 11). EACS suspended Mack with pay for one day and told him that he could be fired if this type of situation happened again. (*Id.*). This was the only disciplinary action Mack faced in the first three years of his employment. (ECF 82, ¶¶ 22–27).

On February 9, 2023, Mack self-reported to EACS that he had accidentally left a student on the bus while he ran into a school building for water. (ECF 84-2, at 13). He had left the school by the time he called this in and reported that he would drive the student back. (*Id.*). Mack confessed he was required to walk through the bus to ensure no one had been left on board but had

failed to do so. (*Id.*). EACS issued Mack a "Final Written Reprimand" the next day. (*Id.*). The reprimand required Mack to attend further bus driver training, but did not result in any suspension or disruption in pay. (*Id.*). It also informed Mack that any future missteps could cause him to be fired. (*Id.*). Mack signed the reprimand to acknowledge he had read it. (*Id.*, at 14). Mack had the opportunity to provide a written response to this reprimand. (*Id.*, at 13; ECF 82, ¶ 26). He did not. (*Id.*). State law required the incident be reported to the state within five working days. Ind. Code § 9-21-12-19(e). It was not. (ECF 84-2, at 26).

Mack's final incident occurred on January 22, 2024. A faculty member reported to EACS that Mack had almost backed the bus into him and a student because Mack had left the bus lane without being dismissed or waiting for the sidewalk to clear. (ECF 82, ¶ 28). In response, Good reviewed bus footage of the incident along with Smith, McCann, and Prosser. (*Id.* ¶ 30). They concluded that Mack put the faculty member and student in danger. (*Id.*). Good then met with Mack on January 23, where she showed him video of the incident and suspended him pending a further investigation. (*Id.* ¶¶ 30–33).

Good conducted the investigation between January 24 and 26. (*Id.* ¶ 34). As part of the investigation, Good reviewed video of the January 22 incident from inside the bus. (*Id.* ¶ 35). The footage revealed that on top of what was already reported, Mack had left a student unattended on the bus with the keys still in the ignition. Mack also failed to perform his required visual inspection. (*Id.*). This prompted Good to review more footage of Mack's bus. Her review uncovered footage showing Mack had done the same thing on three other occasions in the preceding three weeks. (*Id.* ¶ 36). School Defendants submitted the videos for the record. (ECF 86). Each time, Mack left the same student alone on the bus and went into the school building for stretches of time ranging from

30 seconds to more than 4 minutes. (ECF 82, ¶ 38). On January 25, Good reported to the IDOE—as she was required to by state law—that Mack had left students unattended on his bus. (*Id.* ¶ 37).

On January 26, Good emailed Mack to request he attend a meeting on January 29 at 1 p.m. (*Id.* ¶ 39; ECF 84-3, at 14). The same day, Mack sent Hissong a grievance letter contesting his suspension and the allegations made by the faculty member. (ECF 84-1, at 6–7). The letter made no mention of the student left on the bus unattended. (*Id.*). Mack sent another letter trying to pursue a grievance on January 28, this time to Prosser. (ECF 84-2, at 16–17). This letter also did not mention the unattended student. (*Id.*).

On January 29, Mack requested to use one month of leave under the Family and Medical Leave Act ("FMLA") and reported he could not attend the scheduled meeting with Good. (ECF 82, ¶ 44–46). Mack got the FMLA paperwork completed by his doctor. (*Id.* ¶ 47). The next day,[4] Good and Prosser sent Mack a letter detailing the findings of the EACS investigation and notifying him that he was fired. (*Id.* ¶¶ 48–50). The letter referenced the 2023 and 2024 incidents of Mack leaving a student on the bus, as well as the unsafe driving incident from January 22 when he almost hit a student and faculty member.[5] (*Id.* ¶ 50).

Mack made three subsequent attempts between February 1 and March 5, 2024, to file an informal grievance against EACS despite the school having no informal grievance process. (*Id.* ¶¶ 53–67). Mack could only pursue formal grievance through the EACS Union, something Hines explained when he replied to Mack's first letter on February 1. (*Id.* ¶¶ 53–56). The Union never filed a grievance or arbitrated the school's firing of Mack. (*Id.* ¶ 57). Different people in the EACS

---

[4] The date on the letter is January 24, 2024. (ECF 84-2, at 21). School Defendants state that this was an error, and the letter was in fact sent on January 30, 2024. (ECF 82, ¶ 49). Mack does not dispute this, and the Court finds this explanation from School Defendants to be accurate.

[5] Mack disputes that the letter mentioned the incidents. (ECF 73). The letter shows otherwise. (ECF 84-2, at 21–22).

administration also responded to his latter two letters, even offering to initiate an informal grievance process despite one not existing. (*Id.* ¶¶ 57–67). Each response offered Mack a detailed explanation of why his conduct provided cause for termination and addressed arguments he made in his letters. (*Id.*). EACS even offered twice to meet with Mack to address his concerns. (*Id.* ¶¶ 60–62). No such meeting occurred, and EACS denied Mack's grievance efforts. (*Id.* ¶ 67).

### B. IDOE's Revocation of Mack's Yellow Card

On January 25, while Good investigated Mack, she reported to Larocco at the IDOE that Mack had left students unattended on his bus. (*Id.* ¶ 37). She asked Larocco to review the 2023 and 2024 incidents. (ECF 95, ¶ 8).

After EACS fired Mack, Good emailed Larocco on February 2, 2024, asking to talk about the situation. (ECF 59, at 16–17). Later that day, Larocco revoked Mack's yellow card for six months and wrote a letter notifying Mack of this decision. (ECF 84-2, at 26–28). Larocco's letter informed Mack that the 2023 and 2024 incidents formed the basis of the revocation. (*Id.*). Larocco based his authority to issue the revocation on Indiana Code § 20-27-8-15(e)(2), which allows the IDOE to issue a six-month revocation for "circumstances endangering the safe transportation of students." (ECF 93-1, ¶ 12). Beyond this catch-all phrase, the statutory subsection prescribes specific penalties for specific judgments entered against bus drivers. Ind. Code § 20-27-8-15(e)(2). Six-month revocations are called for when there is "a judgment for a Class B or Class C infraction that endangers the safety or safe transportation of a student." § 20-27-8-15(e)(2)(D). No such judgment exists against Mack.

The letter also laid out a process for Mack to pursue an appeal of his revocation. (ECF 84-2, at 27–28). If he wanted to appeal, Mack could send a letter requesting a hearing to Larocco or the Indiana State School Bus Committee ("ISSBC") within five days of Mack's receipt of the

letter. (*Id.*). His letter would have needed to detail the reason he wished to appeal and include relevant information that he believed the ISSBC should consider. (*Id.*, at 28).

Larocco sent his February 2 letter to Mack's home address by certified mail. (ECF 118-3, at 14–15). The United States Postal Service ("USPS") attempted delivery on February 7, but no authorized recipient was available. (*Id.*, at 15). The letter remained available for redelivery or pickup at a Fort Wayne post office for the next thirty days. (*Id.*) Neither occurred, and the letter was returned to sender on March 11. (*Id.* at 14).

While the letter was still with USPS, Larocco called Mack on February 23, 2024, and spoke with him about the decision to revoke his yellow card. (ECF 95, ¶ 14). Larocco states that he explained the appeal process to Mack on this phone call and offered to refer the appeal information to the ISSBC himself, but Mack indicated no desire to appeal. (*Id.* ¶¶ 15–18). Mack, in turn, says Larocco never mentioned the appeal process, and that he would have pursued an appeal if Larocco told him that one existed. (ECF 118-1, ¶ 2).

### III.    **Procedural History**

Mack filed three state court lawsuits in response to his firing and yellow card revocation. In his first, filed on February 12, 2024, he sued School Defendants and Larocco for claims alleging violations of his due process rights under 42 U.S.C. § 1983. *Mack v. E. Allen Cnty. Schs. Bd. of Trs., et al.*, Cause No. 02D02-2402-CT-000119. He also alleged School Defendants discriminated against him in violation of 42 U.S.C. § 1981 and violated Section 301 of the LMRA because his firing was not arbitrated. (*Id.*). Defendants promptly removed the case to this Court. (ECF 1).

The second case, filed on February 29, 2024, brought a state-law claim against EACS and the IDOE seeking judicial review of his firing and revocation. *Mack v. E. Allen Cnty. Schs. Bd. of Trs., et al.*, Cause No. 02D02-2402-CT-000119. The Allen Superior Court dismissed his case a

few months later, holding that he failed to state a claim against EACS and failed to exhaust his administrative remedies before suing the IDOE[6]. *Id.*, at 6/11/2024, "Order Issued."

Finally, after filing a Charge of Discrimination against the school and receiving his Notice of Right to Sue from the EEOC, Mack sued EACS in January 2025 for employment discrimination in violation of Title VII. *Mack v. E. Allen Cnty. Schs.*, Cause No. 02C01-2501-PL-000025, at 1/27/2025, "Complaint/Equivalent Pleading Filed." EACS also promptly removed this case. *Mack v. E. Allen Cnty. Schs.*, Case No. 1:25-CV-63-HAB-ALT, ECF 1 (Feb. 13, 2025). Both cases that Defendants removed to this Court have since been consolidated. (ECF 63). Mack has pointed to several other things beyond his job discipline to support his race discrimination claims. These include a Spring 2023 incident where a white school worker named Amy Ferguson was hostile towards him; an allegation that he was assigned less desirable bus routes based on race; an allegation that he complained of unfair racial hiring practices in 2019; and an allegation that other drivers who had been in accidents were not fired. (ECF 82, ¶¶ 80–88).

## **LEGAL STANDARD**

Summary judgment is appropriate if a moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing a motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). Put another way, a court will only grant summary judgment "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor." *Sorensen v. WD–40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015). The fact that the parties have filed cross-motions

---

[6] The Court's order acknowledged that a factual dispute existed over whether Mack had received notice of his right to appeal to the ISSBC. *Mack v. E. Allen Cnty. Schs. Bd. of Trs., et al.*, Cause No. 02D02-2402-CT-000119, at 6/11/2024, "Order Issued."

for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

Regardless of the party presenting the motion, the Court does not supersede the jury's role in making credibility determinations and weighing the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This is especially true in employment discrimination cases, where "issues of intent and credibility are especially crucial." *Wright v. Ill. Dep't of Corrs.*, 204 F.3d 727, 730 (7th Cir. 2000).

## DISCUSSION

### I.    Mack's Claims Against School Defendants

School Defendants seek summary judgment on the laundry list of claims that Mack has pursued against them. Mack asserts seven bases for a due process claim against School Defendants under Section 1983. He also argues that several different incidents—some related to his firing and some not—support claims for racial discrimination. Lastly, he insists that School Defendants violated the LMRA when they failed to arbitrate his grievance.

#### A.  Due Process

School Defendants first seek summary judgment on Mack's Section 1983 claim alleging violations of his due process rights. The Fifth and Fourteenth Amendments establish that states cannot deprive any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V; U.S. Const. amend. XIV, § 1. Due process typically requires any deprivation to "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). The notice must be "reasonably

calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314.

To prove a due process violation, a plaintiff must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). *Mathews v. Eldridge*, 424 U.S. 319 (1976), established a three-factor balancing test for whether a procedure is constitutionally accurate. The *Mathews* test requires courts to balance (1) the private interest at stake, (2) the risk of erroneous deprivation, and the value of any procedural safeguards, and (3) the government's countervailing interests. *Id.* at 335. These factors do not always carry equal weight because due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Rest. Workers v. McElroy,* 367 U.S. 886, 895 (1961).  It is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). Before the Court reaches the *Mathews* test, however, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "Only after finding the deprivation of a protected interest does the Court look to see if the State's procedures comport with due process." *Id.*

Mack alleges due process violations based on (1) his Final Written Reprimand from February 10, 2023, (2) the School Defendants' delay in reporting the events that led to the Final Written Reprimand to the IDOE, (3) his January 24, 2024 suspension, (4) his firing, (5) the failure to properly train him, (6) the failure to provide him a bus monitor, and (7) the school assigning him undesirable bus routes.  Of these claims, only three can be said to implicate a property

interest.[7] As the School Defendants acknowledge, the Supreme Court has long recognized that public employees dismissible only for cause—like Mack—have a strong property interest in continued employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985). As a result, they are generally entitled to "some form of pretermination hearing." *Id.* at 542. This hearing "need not be elaborate" though, and "something less than a full evidentiary hearing is" generally "sufficient prior to adverse administrative action." *Id.* at 545. There are some circumstances "where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).

The Court turns then to the three actions that implicate his property right in continued employment, i.e., his Final Written Reprimand, his suspension, and his firing. There is little question from the undisputed record that the School Defendants gave Mack some process for all three disciplinary actions. The question is whether those processes were constitutionally adequate to satisfy the demands of "due" process. The Court concludes they were.

To determine whether the School Defendants actions prior to undertaking any of the three disciplinary actions deprived Mack due process, the Court applies "the sliding-scale approach of *Mathews v. Eldridge*, which requires comparison of the costs and benefits of alternative remedial mechanisms." *Holly v. Woolfolk*, 415 F.3d 678, 680 (7th Cir. 2005) (citing *Mathews v. Eldridge*,

---

[7] Aside from his interest in continued employment, Mack's allegations have no underlying basis in the due process clauses of the Constitution and can be summarily rejected. For instance, he has no liberty or property interest in receiving more job training than what the state requires. Nor does he have such an interest in having a bus monitor or a bus route of his choice. Without a protected property or liberty interest, there is no basis in the law for Mack's claim to a remedy for being deprived of them and so the Court sets aside these assertions. The same is true for Mack's belief that EACS' non-compliance with state law by failing to report Mack's February 2023 incident to the state within five days creates some sort of entitlement to relief. The statute imposes a reporting duty on the school; it does not create any individual rights for the driver. Mack points to no caselaw that indicates otherwise.

424 U.S. 319, 332–35 (1976)). Under *Mathews*, the Court considers: (1) Mack's property interest in continued employment; (2) the risk that the disciplinary processes will result in an erroneous deprivation of Mack's property interest; and (3) the School Defendants' interests in effective discipline and student safety.

Without question, Mack's interest in continued employment that allows him to make a living is very high. *See Gilbert*, 520 U.S. at 932. So too is School Defendants' interest in protecting the young students entrusted to their care and effectively disciplining employee misconduct. Balanced against each other, these factors are entitled to equal weight in all three actions taken against Mack. But the risk of erroneous deprivation increased with each progressive disciplinary step from reprimand to termination.

The Final Written Reprimand from February 10, 2023, entailed the least process, but also required the least. Mack was on notice of the conduct at issue because he self-reported the incident the day before. The Final Written Reprimand that followed notified him of his discipline related to the conduct he already reported. His only punishment was to attend further training and a warning that future discipline could result in termination. Mack also had the opportunity to file a written response and signed the reprimand to acknowledge receipt and his ability to respond. The risk of an erroneous deprivation here, where Mack reported his own misconduct, is very low. *Cf. Jones v. City of Gary, Ind.*, 57 F.3d 1435, 1443 (significant independent verification greatly reduces the risk of erroneous deprivation). Beyond that, the discipline issued here did not alone deprive Mack of his property interest in his job. He missed no work and his pay was not disrupted. Thus, School Defendants gave Mack an appropriate level of process under *Mathews* when the Final Written Reprimand was issued.

12

School Defendants also gave Mack due process when they first suspended him and later fired him. They provided Mack notice and an opportunity to be heard, then subsequently bent over backwards at every turn to indulge his pursuits of several different challenges to the allegations against him. The day after the faculty member reported the January 22, 2024, safety incident, Good left Mack a note on his bus instructing him to attend a meeting about it. She showed him video footage of the incident in the meeting and gave him the opportunity to explain himself before suspending him pending further investigation. Due process calls for "notice and opportunity for hearing appropriate to the nature of the case." *Mullane*, 339 U.S. at 313. The note gave him notice. The meeting provided Mack the chance to respond to the allegation against him. The meeting did not need to "definitively resolve" his case and sufficed to provide "an initial check against" a "mistaken decision[]." *Loudermill*, 470 at 545. While the suspension without pay deprived him of an important property right, School Defendants' interest in student safety justified an interim suspension. Further, Mack could continue contact with Good throughout the investigation, a formal grievance process existed that Mack could have pursued, and School Defendants gave credence to his attempts to pursue an informal grievance during his pre-termination suspension even though it was not standard practice.

Mack also received more process before EACS fired him. Good wrote Mack to inform him when the investigation had concluded and scheduled a meeting for a few days out to review the findings. That gave Mack notice, and the meeting was his opportunity to be heard. He attempted to go on FMLA leave the morning of the meeting and informed School Defendants he could not attend. As a result, Good conveyed the information Mack would have been informed of in that meeting via letter. The hearing did not happen, but Mack had the opportunity. Separate correspondence sent to Mack later that week also put him on notice that he could try to pursue a

formal grievance through his union. Grievance procedures created by collective bargaining agreements typically satisfy due process so long as there is pre-deprivation notice and an opportunity to be heard. *See Chaney v. Suburban Bus Div. of Reg'l Transp. Auth.*, 52 F.3d 623, 629 (7th Cir. 1995). Mack never pursued a formal grievance. School Defendants also offered to make up the meeting with Mack several times after his termination letter was sent, but Mack never took them up on it. At a base level, School Defendants only needed to provide "oral or written notice of the charges against [Mack], an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. They did that and then some. "To require more . . . prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.*

In sum, School Defendants gave Mack the required pre- and post-deprivation process each time they were required to do so. They have therefore complied with due process. Their motion for summary judgment on Mack's due process claim is granted.

### B. Discrimination

School Defendants also argue that Mack has failed to provide evidentiary support for his discrimination claims under Title VII and 42 U.S.C. § 1981. These claims are analyzed together because "they both require the plaintiff to prove the same prima facie elements." *Hobbs v. City of Chicago*, 573 F.3d 454, 460 n. 1 (7th Cir. 2009).

To survive summary judgment, "a plaintiff must present evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (internal quotations omitted). Thus, the "sole question that matters" is whether a reasonable juror could conclude that Mack would have kept his job if he had a different

race, and everything else remained the same. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

There are two ways the Court may analyze Mack's case. First, the Court may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Second, as the Seventh Circuit explained in *Ortiz*, the Court may also simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff[']s race . . . caused the discharge or other adverse employment action." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under *McDonnell Douglas*, Mack must first set forth a prima facie case of racial discrimination. 411 U.S. at 802. To do this, Mack must show that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). Next, if Mack can make this prima facie showing, the burden shifts to School Defendants to "present a legitimate, non-discriminatory reason" for his firing. *Id.* Finally, if School Defendants carry that burden, then Mack must show that the reason offered by School Defendants is pretextual. *Id.*

Mack cannot make a prima facie case. Although he is a member of a protected class and he suffered an adverse employment action, Mack cannot identify similarly situated non-black individuals that received better treatment. Comparators must be comparable in "*all material respects*" including performance, qualifications, and conduct. *Swidnicki v. Brunswick Corp.,* 23 F. Supp. 3d 921, 931 (N.D. Ill. 2014) (emphasis added). When comparing employees alleged to have engaged in similar misconduct, "the critical question is whether they have engaged in conduct of comparable seriousness." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012).

Mack offers three comparators, though he only names two: Steven Hathaway and Amy Ferguson. But he falls short on demonstrating that they engaged in similar conduct or conduct of comparable seriousness. The most serious conduct offered for a comparator is that Hathaway, another bus driver, got into an accident. But Mack offers nothing to show that Hathaway was at fault, endangered students, or engaged in conduct that was otherwise of comparable seriousness to his own alleged conduct. Mack also does not explain what discipline Hathaway was subject to, if any. Further, Mack engaged in multiple violations and was disciplined multiple times. There is nothing to suggest that Hathaway engaged in a pattern of violations. Mack also vaguely, and without evidentiary support, asserts that Good had a pattern of condoning bus drivers endangering students. Simply put, Mack has not shown that Hathaway is a suitable comparator.

For similar reasons, Mack's unnamed comparator—another bus driver—is also not suitable. Mack references a 2023 accident in which this anonymous driver's bus got hit by an SUV. (ECF 26, at 6). He alleged that the police report noted that the driver stopped the bus, did not see the SUV coming, and then proceeded into the intersection where the collision occurred. (*Id.*). Like with Hathaway, Mack has offered nothing to show that this driver was at fault, engaged in conduct similar to him, or committed a similar number of violations as him. He has also not established what discipline, if any, this driver received. But most fatally, he does not even identify who the driver is. Whoever this driver is, Mack has not established that they are a suitable comparator either.

Finally, Mack points to Ferguson's conduct towards him in an attempt to establish her as a comparator.[8] But that is a non-starter. Ferguson is not a bus driver, did not engage in remotely

---

[8] Mack alleges that Ferguson aggressively approached Mack, got in his face, and screamed at him in front of several students and staff members. (ECF 26, at 7).

16

similar misconduct, and only had one incident as opposed to his several. She is not a valid comparator.

But even if Mack could demonstrate a similarly situated non-black employee was treated more favorably, he has additional issues. There is some dispute in the record over whether Mack was meeting his employer's legitimate expectations: he disputes the fact of the near-miss and the severity of leaving the students unattended. But these events are precisely the reason given by the School Defendants to terminate him. "Where legitimate expectations and pretext overlap," as is the case here, the Court "can be more efficient by addressing both together rather than first determining whether there is a *prima facie* case of discrimination and then turning to pretext." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). This also does more to align with and address the holistic approach the Seventh Circuit embraced in *Ortiz*. "If the employer offers a non-discriminatory reason for the termination and we determine the reason is not pretextual, we can skip the remaining analysis of the prima facie case." *Id.* Pretext "means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). A plaintiff "must demonstrate pretext by a preponderance of the evidence." *Brooks*, 39 F.4th at 435. If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). In other words, "the only question is whether the employer honestly believed it had a non-discriminatory reason for termination." *Brooks,* 39 F.4th at 436.

School Defendants assert that they terminated Mack because he almost hit a faculty member and a student with his bus. An investigation into that conduct revealed that Mack also repeatedly left a special needs student alone on a bus with the keys in the ignition. These events occurred after Mack had already been disciplined for similar conduct the year before. These

17

incidents, which the School Defendants argue endangered students, provided a legitimate, non-discriminatory reason for firing Mack. They are the reasons School Defendants have consistently pointed out from Mack's termination correspondence all the way through this litigation. In response, Mack has developed no facts which suggest that the School Defendants did not honestly believe he committed the above offenses or that they lied about his conduct as a cover for racial pretext. No evidence in the record supports an inference of racial discrimination beyond Mack's mere speculation. "Guessing at an employer's hidden animus or inner prejudice, however, is not enough to defeat summary judgment. The employee must support h[is] hunch with evidence." *Id.* Because Mack has not offered any such evidence, he has failed to raise a material factual dispute over whether he met School Defendants' legitimate expectations or whether their reason for firing him was pretext for racial discrimination. Thus, a reasonable jury could not conclude that Mack's firing was discriminatory.

Many of Mack's other allegations of race discrimination fail to state a claim that can be pursued under Title VII or Section 1981. He has developed no facts to suggest that School Defendants gave him worse bus route assignments or the failed to assign a bus monitor for the special needs students on his route because of his race. School Defendants have explained that the routes are assigned on a bidding system that does not consider race. Mack has not disputed that or offered any contrary evidence. They have also explained that the special needs students on Mack's bus routes did not require a monitor, and Mack has offered nothing to refute that either.

Finally, Mack has also alleged retaliation as part of his race discrimination claims. He fares no better here. To prove retaliation, plaintiffs must show that "(1) they engaged in protected activity, (2) they suffered adverse employment actions, and (3) there was a causal connection

18

between the protected activity and the adverse employment actions." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

Mack does not identify any protected activity he engaged in. At best, Mack could be suggesting that his report of Ferguson's aggressive behavior towards him, or his complaint of unfair racial hiring practices in 2019 were protected activity. But he leaves this argument undeveloped, and the Court is not required to scour the record in search of facts that could support his claim. Even if the Court gives him the benefit of any doubt, Mack fails to establish causation between those events and his termination. More importantly, Mack engaged in intervening acts of misconduct which, in this case, serves to break the causal chain. *Brown v. N. Tr. Co.*, 1997 WL 733910, at *4 (N.D. Ill. Nov. 18, 1997) (misconduct occurring after an employee's protected activity breaks the causal chain); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010) (noting generally that an employee that engages in protected activity is not forever thereafter shielded from otherwise appropriate discipline.).

In sum, Mack's claims for racial discrimination or retaliation do not withstand summary judgment. School Defendants' motion for summary judgment on these claims is granted.

## C. **Section 301 of the LMRA**

Lastly, School Defendants seek summary judgment on Mack's LMRA claim. Mack insists that EACS violated Section 301 by failing to arbitrate his grievance following his termination.

The Court previously dismissed Mack's LMRA claim against his union (ECF 66, at 3). This is because the LMRA does not permit Section 301 claims to be brought by employees of "any State or political subdivision thereof." 29 U.S.C. § 152(2). Since public school districts are political subdivisions of the State under Indiana law, *see, e.g.*, *Weaver v. Elkhart Comm. Sch. Corp.*, 95 N.E.3d 97 (Ind. Ct. App. 2018), Mack did not have a cause of action against the union.

EACS and the other School Defendants are all similarly situated and thus entitled to the same outcome. EACS is a public school district. All other individuals in this group defending against these claims are employed by EACS. Thus, they too cannot be liable under Section 301 and Mack lacks a cause of action against them. 29 U.S.C. § 152(2).

School Defendants' motion for summary judgment on the Section 301 claim is granted.

## II.    Mack's Due Process Claim Against Larocco

Mack and Larocco have cross-moved for summary judgment on this due process claim. Mack asserts that he was entitled to a pre-deprivation hearing before Larocco revoked his yellow card for six months. Larocco counters that Mack's opportunity to appeal to the ISSBC after the revocation satisfies the requirements of due process.

A genuine and material factual dispute exists over whether Mack received notice of his post-deprivation right to appeal. Postal records confirm that Larocco's letter to Mack sent through certified mail went undelivered. And the parties disagree over whether Larocco informed Mack of his right to appeal on the February 23 phone call. The record shows Mack was aware of the yellow card revocation before this call despite not receiving the letter, but nothing demonstrates his awareness of the appeal process. Larocco's summary judgment argument that Mack received due process relied on Mack having had adequate post-deprivation state law remedies despite the lack of a pre-deprivation hearing. But the record does not unequivocally establish that Mack received notice of his post-deprivation appeal option. The Court has no recording of Larocco's phone call to Mack, and the parties tell different tales of what was said on that call. Deciding *now* who is telling the truth would require the Court "to make credibility determinations it is not supposed to make at this stage." *Guenther v. Fort Wayne Dough Co., LLC, et al.*, No. 1:24-CV-285-HAB, 2026 WL 796742, at *5 (N.D. Ind. Mar. 19, 2026). Thus, to the extent Larocco's motion is premised on

20

Mack having notice of the post-deprivation process, Larocco's motion for summary judgment is DENIED.

This leads the Court directly to the heart of Mack's motion. Mack asserts that he was entitled to a pre-deprivation hearing before his yellow card was revoked. Larocco, in turn, argues that Mack had no such entitlement and that the appeal process to the ISSBC would have provided Mack an adequate post-deprivation remedy.[9] But constitutional sufficiency of the post-deprivation appeal process matters only if Mack was not entitled to pre-deprivation process. *Simpson v. Brown Cnty.*, 860 F.3d 1001, 1010 (7th Cir. 2017). So the Court must first decide whether Mack was entitled to some amount of process before his yellow card was revoked.

The Court concludes Mack was entitled to some pre-deprivation process. The *Mathews* factors to balance here are like those in Mack's claim against School Defendants, but they differ in meaningful ways.

***Private Interest.*** Against the School Defendants, Mack's private interest centered on his continued employment, already an important interest which "cannot be gainsaid." *Loudermill*, 470 U.S. at 543. Against Larocco, his interest is in his commercial license issued by the state to continue working as a school bus driver. Mack's private interest in keeping his job at EACS was already strong. His private interest in carrying out his livelihood, even if not with EACS, is even stronger "where a license revocation forces [him] not only to find a new job but also to transition to a new field." *Simpson*, 860 F.3d at 1009.

***Risk of Error.*** The process, or lack thereof, that Larocco used here poses an extraordinarily high risk of erroneous deprivation. The statute governing the IDOE's authority to revoke a bus

---

[9] Larocco properly concedes that Mack was "not required to exhaust state remedies to bring a § 1983 claim." *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 939 (7th Cir. 2003).

driver's yellow card does not spell out any specific process to be followed. Ind. Code § 20-27-8-15(e)(2)(D). But Larocco asserts that he has the statutory authority to solely and summarily revoke a driver's yellow card for six months when he determines that a driver has endangered students. The Court harbors serious doubts that Larocco's interpretation of his statutory authority is accurate as applied to Mack's case.[10] But even if it were, that would mean the livelihoods of Mack and every other school bus driver in Indiana could be yanked away based on the decision of one person with no warning and no opportunity to contest the decision before it is made.

Larocco insists he did not solely determine the fate of Mack's yellow card, as he reviewed the situation after School Defendants had conducted a full investigation. While this is true, it misses the mark on what it means for due process purposes. School Defendants and Larocco, though working in conjunction, took very different actions. School Defendants fired Mack from his job after a meeting with him, an investigation, and opportunities—both pre- and post-termination—to respond the allegations against him. Larocco unilaterally took away Mack's license to engage in his chosen profession for six months based on an investigation he did not conduct. These actions involve different interests and require different process.

As the Court explained when it denied Larocco's motion to dismiss, there is "no reason to believe that the cost of basic procedures (e.g., meaningful notice and an informal hearing) would be unduly burdensome in comparison with the protections those additional procedures would provide." (ECF 47, at 5).

**Government Interest.** Finally, the Court understands Larocco and the IDOE's interest in keeping children safe and handling discipline bus drivers that might be endangering students

---

[10] *See* ECF 47, at 3 (describing how the statute seems to presuppose the existence of a civil or criminal judgment against a driver, which has not occurred here).

efficiently. And summary administrative actions can be justified "in emergency situations." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981); *see id.* (holding that the government can order a mine to shut down to prevent disaster if followed immediately by notice and a hearing). "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *FDIC v. Mallen*, 486 U.S. 230, 240 (1988).

Mack's case does not present circumstances that justify bypassing pre-deprivation process. If the school's allegations are correct, he should not have been consistently leaving a student alone on a bus with the keys still in the ignition. Nor should he have moved the bus without properly checking his surroundings for pedestrians. But these incidents did not raise an immediate emergency or make Mack such a danger that pre-deprivation process could not have been provided. This is especially true because Larocco knew when he took action that EACS had fired Mack and he was no longer driving a bus. The cases Larocco cites to suggest his approach was constitutionally sound involve less substantial property interests, more substantial assurances that the deprivation is not baseless, far more substantial government interests, or some combination thereof. *See Mallen*, 486 U.S. at 240 (FDIC can suspend its president when indicted for a crime involving dishonestly or breach of trust); *Barry v. Barchi*, 443 U.S. 55 (1979) (state horseracing authority can suspend a horse trainer if their horse tests positive for drugs); *Rhein v. Coffman*, 118 F. Supp. 3d 1093, 1100 (N.D. Ill. 2015), *aff'd*, 825 F.3d 823 (7th Cir. 2016) (police can seize guns and revoke a firearms license of an individual when he makes several shooting threats against the office of an elected official). Larocco has simply not convinced this Court that given the circumstances surrounding Mack's license suspension, he could not have been given some

23

minimal level of process before Larocco summarily suspended his yellow card and deprived him of his livelihood. For this reason, Mack is entitled to summary judgment against Larocco on his claim that he was entitled to pre-deprivation process.

One final word is necessary. The Court is not holding that there are no circumstances under which the IDOE can summarily revoke a bus driver's license. If a civil or criminal judgment has been entered against a bus driver for a violation of state law before his yellow card gets revoked—as the statute Larocco attempts to rely on contemplates—then the driver would have been given due process through the court proceedings. Mack's conduct simply did not reach that level and due process demanded that Larocco provide Mack notice and an opportunity to be heard before revoking his yellow card. Because Larocco failed to do so, Mack prevails.

### **CONCLUSION**

School Defendants' motion for summary judgment against Mack (ECF 81) and Mack's motion for summary judgment against Larocco (ECF 73) are GRANTED. Larocco's motion for summary judgment against Mack (ECF 93) is DENIED.

The Court will schedule further proceedings on Mack's prevailing case against Larocco by separate order.

**SO ORDERED** on March 30, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT